| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>EASTERN DISTRICT OF NEW YORK | Hearing Date and Time:<br>May 13, 2020 at 2:30 p.m. |

-------------------------------------------------------------x

In re:                                                                          Chapter 11

138 QB Acquisition Corp.,                                      Case No. 20–41816–CEC

                                      Debtor.

-------------------------------------------------------------x

**DEBTOR'S OPPOSITION TO MOTION OF BRIAR MG, LLC**
**AND SG QUEENS LLC TO DISMISS THE CHAPTER 11 CASE,**
**OR, ALTERNATVELY, VACATE THE AUTOMATIC STAY**

138 QB Acquisition LLC, (the "Debtor"), as and for its Opposition to the motion (the "Motion") of Briar MG, LLC and SG Queens LLC (jointly, "Owners") seeking to dismiss this Chapter 11 case, or, in the alternative, to vacate the automatic stay, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1. This Chapter 11 case was filed in absolute good faith for the legitimate business purpose of attempting to preserve potentially expiring rights under a Purchase and Sale Agreement dated March 12, 2020 (the "Sale Contract") relating to the Debtor's intended acquisition of development property at 138-23 Queens Boulevard, Briarwood, NY (the "Property") for the sum of $12,950,000, inclusive of a down payment of $1,295,000 (the "Deposit").

2. In knee-jerk fashion, the Owners have moved to dismiss the Chapter 11 case, or in the alternative to vacate the automatic stay, essentially arguing that the bankruptcy primarily involves a two-party dispute that was purportedly filed in bad faith. To be sure, the key combatants are the Debtor as the would-be purchaser of the Property and the Owners as the joint tenants-in-common owners. However, the validity of the Chapter 11 filing cannot be analyzed

without a keen appreciation of the truly historic circumstances that the Debtor faced on April 6, 2020 when the Chapter 11 petition was filed (the "Petition Date").

3. Owners' dry recitation of the facts, otherwise punctuated by misstatements and omissions, ignores four critical points. <u>First</u>, contrary to the Owners' effort to promote the sanctity of the Sale Contract over anything else, the Debtor was victimized by unscrupulous sellers who fraudulently induced execution by furnishing the Debtor with schematic drawings (the "Drawings") that falsely stated the square footage of the Property to be 29,784 square feet, when it was only approximately 24,000 square feet. This discrepancy diminished both the potential future buildable space at the Property and eroded the value of the Sale Contract. There is written corroboration of the Debtor's fraudulent inducement claims, which were promptly brought after the Petition Date through an adversary proceeding on April 21, 2020. A copy of the adversary complaint is annexed hereto as <u>Exhibit</u> "A", including the Drawings containing false information attached as Exhibit "A" thereto.

4. <u>Second</u>, despite their own wrongdoing, the Owners held firm to insisting on a time of the essence closing for April 7, 2020. The Owners' insistence in proceeding was done notwithstanding the utter turmoil occasioned by the Covid-19 crisis. As everyone knows, the crisis is a true national emergency that was rapidly accelerating in early April. New York was closed for business, as all non-essential activities were suspended through Governor Cuomo's highly restrictive "New York State on PAUSE" executive orders[1]. In the face of the burgeoning

---

[1] New York City became the epicenter of the Covid-19 outbreak in the U.S. and has generated a sweeping response by the Governor. On March 7, 2020, Governor Cuomo declared a state-wide emergency effective through September 7, 2020. Through a series of Executive Orders which remain in place until at least May 15, 2020, the State has banned all in-person gatherings, effectively ordered all non-essential businesses to close by reducing the work force by 100%, and suspended all residential and commercial foreclosures and evictions for 90 days. The Chief Administrative Judge, Lawrence K. Marks, issued Administrative Order 78-20 on March 22, 2020

crisis, the Owners proved unreasonable in their efforts to force the Debtor's hand regarding a closing, sensing an opportunity to obtain forfeiture of the Deposit.

5.     Third, on April 6, 2020, the situation on the ground was that the state courts in New York were closed to the filing of any type of legal action by the Debtor.  Moreover, the Debtor had no resort to the Federal District Court since diversity of citizenship does not exist.  Without a functioning state court system, the Debtor had no opportunity to seek a stay of the closing pending a decision on its fraudulent inducement claims outside of bankruptcy.  Due to the confluence of events, the Bankruptcy Court was literally the only judicial forum in the State available on April 6, 2020 to preserve the status quo.  Indeed, the Bankruptcy Court still remains the only forum available to the Debtor a month or later, since state courts are still not accepting the filing of new actions.

6.     Fourth, the Bankruptcy Code not only grants an automatic stay of a declaration of default by the Owners under 11 U.S.C. §362(a), but also grants an automatic sixty (60) day extension of time to perform under 11 U.S.C. §108(b).  This sixty day extension is a unique feature of bankruptcy law without an analogue under state law.  It has been consistently recognized that a bankruptcy filing motivated to extend a closing date for at least sixty days is permissible.  In fact, many cases acknowledge that invoking 11 U.S.C. §108(b) in a real estate context is a proper basis to seek Chapter 11 relief, and reason alone to deny the Owner's Motion. *See*, *In re AAGS Holdings LLC*, 608 B.R. 373 (Bankr. S.D.N.Y. 2019); *In re Empire Equities Capital Corp.*, 405 B.R. 687 (Bankr. S.D.N.Y. 2009); *In re Walden Ridge Development LLC*, 292 B.R. 58 (Bankr. N.J. 2003); *In re New Breed Realty Enterprises, Inc.*, 278 B.R. 314 (Bankr. E.D.N.Y. 2002); *In re Future Growth Enters.*, 61 B.R. 469 (Bankr. E.D.Pa. 1986); *In re G-N*

---

prohibiting the filing of new, non-essential legal actions and proceedings.

3

*Partners*, 48 B.R. 462 (Bankr. D.Minn. 1985); and *In re Santa Fe Development & Mort. Corp.*, 16 B.R. 165 (9th Cir. BAP 1981).

7.  Counsel for the Debtor has also successfully used Section 108(b) in unreported cases in this Court and the Southern District of New York, including *In re Rover 2014 LLC* (15-70166-AST), *Maddd West 38 LLC* (16-45836-CEC); *In re 437 88 LLC* (17-45321-ESS), and *In re 1567 York, LLC* (17-11953-MKV), to obtain such relief, which in many instances led to confirmation of a plan of reorganization.

**BACKGROUND FACTS**

### A. Immediate Lead-Up to Chapter 11 Filing

8.  The Debtor obtained an assignment of the Sale Contract on March 31, 2020, with prior notice to the Owners, as permitted pursuant to Section 9(a) thereof. By the end of March, issues had already surfaced regarding the Sale Contract. Due to the Covid-19 crisis, the filing of a Chapter 11 was openly discussed with the Owners' counsel, primarily Brian Sampson, Esq. and Bruce Lederman, Esq.

9.  There is an exchange of emails between counsel, collectively annexed hereto as Exhibit "B", highlighting these discussions. The emails begin on April 1, 2020 and run through the day prior to the Chapter 11 filing. These communications establish that the Debtor was mindful of the challenges faced by Owners' counsel during the Covid-19 crisis. Many of the attorneys involved maintained a prior cordial professional relationship, and the emails were sent as a professional courtesy to avoid the need for the Owners to prepare for a closing, knowing that there was going to be a Chapter 11 filing to resolve the ongoing disputes, since the state courts were closed.

10. Nothing about the Debtor's heads-up regarding a likely Chapter 11 filing should be read as a basis for a breach or anticipatory default. To the contrary, the Debtor was mindful of other people's time during a crisis while preserving all of its rights. Thus, it is disappointing that the Owners now attempt to twist professional courtesy into some form of forfeiture of rights, which was not the intention and should not be miscast.

### B. The Debtor Retains Significant Fraudulent Inducement Claims

11. Negotiations commenced regarding the acquisition of the Property in January. During these negotiations, the Drawings were emailed to Debtor's representative Ilan Elishayev, in mid-February 2020 by the Owners' representatives, Lenny Bayer and Ivan Goodstein, to demonstrate the scope of the potential development.

12. In the context of the negotiations, the Adversary Complaint alleges that the Owners assured the Debtor's representative, Ilan Elishayev, the Drawings accurately reflected the total lot size of the Property, and could be relied upon to calculate the Property's potential building square footage.

13. In this regard, the Drawings expressly reflected in the top left hand corner that the Property had a total lot area of 29,784 square feet. As one would expect, the greater the lot size, the greater the potential buildable square footage at the Property. In this case, a lot area of 29,784 square feet allows for redevelopment of the Property to build approximately 89,000 square feet of new space.

14. After the Sale Contract was signed on March 12, 2020, however, it was subsequently learned that the Drawings materially misrepresented and overstated the actual lot size of the Property. Indeed, it is further alleged that the furnishing of the Drawings was a part of

the Owners' efforts to force a relatively quick closing, as the time to do so was less than thirty (30) days later on April 7, 2020.

15. In any event, instead of a total lot size of 29,784 square feet, the true lot size of the Property is approximately 24,000 square feet. This significantly reduces the potential redevelopment of the Property to approximately 73,000 square feet of buildable space.

16. The Debtor's prime contention is that the execution of the Sale Contract was fraudulently induced by reason of the knowing dissemination of false information. Without the ability to obtain a judicial ruling in state court, the Debtor filed a Chapter 11 petition on April 6, 2020 (the day prior to the scheduled closing), invoking both the automatic stay provisions of 11 U.S.C. §362 and the automatic sixty-day extension of time to close the Sale Contract provided by 11 U.S.C. §108(b).

17. Within two weeks after the Petition Date, the Debtor commenced the above mentioned adversary proceeding (Adv. Pro. No. 20-01045) (the "Adversary Proceeding") seeking, *inter alia*, a declaratory judgment of the Debtor's right to rescind the Sale Contract by reason of fraudulent inducement, and an injunction staying the closing while the Adversary Proceeding is litigated, even beyond the sixty-day extension provided by 11 U.S.C, §108(b), by reason of the Covid-19 crisis.

## ARGUMENT

### A. The Petition was Filed in Good Faith

18. Much like the often-cited observation of the late Supreme Court Justice Potter Stewart that he knew obscenity when he saw it, Bankruptcy Judges instinctively know bad faith when they see it. A bad faith filing has a certain odor to it, lacking any possible basis for success,

and designed solely to delay or frustrate creditors, usually in the face of an imminent foreclosure or eviction. This is not such a case!

19. The Debtor ventures to say that there is not a single decision ever written involving issues of bad faith to preserve contractual rights during times when state courts are closed for business. The Debtor is certain of this circumstance simply because the suspension of the New York State courts has not occurred in anyone's lifetime.

20. For purposes of this Motion, Covid-19 so dominates the good faith analysis that traditional principles do not work. That being said, Covid-19 is not the sole basis for the Chapter 11 filing. Even under normal circumstances, the Chapter 11 filing was still done in good faith since resort to U.S.C. §108(b) is a proper basis to invoke Chapter 11.

### B. Invocation of 11 U.S.C. §108 (b) is Permissible

21. The Owners contend that invocation of §108(b) is a sign of bad faith, citing to this Court's decision in *New Breed Realty*, 278 B.R. 314 (Bankr. EDNY 2002). The Owners, of course, misread the Court's decision in *New Breed Realty*, which recognized the applicability of the provisions of 11 U.S.C. §108(b); but denied a motion to assume a contract where the motion was filed <u>after</u> the sixty-day deadline had already expired. *New Breed Realty* stands for the proposition that the sixty (60) day extension can be a hard deadline.

22. Importantly, this Court suggested that the relief would have been granted had the motion been made timely:

> "In this case, the debtor's time to tender the additional $300,000 deposit and to close the sale under the Agreement had not expired on the Petition Date. If § 108(b) is applicable, the debtor's time to tender the deposit and close the sale was extended to August 29, 2001 (60 days from the Petition Date). In any event, the debtor failed to cure its defaults within the 60-day period provided under § 108(b). Therefore, § 108(b) provides no assistance to the debtor unless the court grants an extension of time beyond the statutory 60-day period. To the extent that this Court has any authority to

7

> extend the cure period under § 108(b), the debtor has not shown that an extension should be granted."

*Id.*, at 317.

23. A recent case, more directly on point, *In re AAGS Holdings LLC*, 608 B.R. 373 (Bankr. S.D.N.Y. 2019), although cited by Owners, also supports the Debtor's filing. In *AAGs, supra,* the Hon. Stuart Bernstein there denied a motion to dismiss for bad faith even though the Chapter 11 petition was filed on the same day as the scheduled closing to preserve rights under 11 U.S.C. §108(b), noting that "[B]ecause the PSA was live, Bankruptcy Code § 108(b) extended the Closing Date by sixty days". Judge Bernstein then denied dismissal of the Chapter 11 case since there was evidence that the debtor intended to reorganize, as is the case here, although the path forward needs to be clarified through the Adversary Proceeding.

24. Similarly, in *In re Walden Ridge Development*, 292 B.R. 58 (Bankr. NJ 2003), the Court denied a motion to dismiss a Chapter 11 case for bad faith even though the sole purpose of the filing was to gain additional time to close under a time of the essence real estate contract. The decision in *Walden Ridge Development* is virtually on all fours this case, even to the point that it involved an assignment of the contract on the eve of the time of the essence closing, and provides strong support for the *bona fides* of the Debtor's filing:

> In summary, the test to be applied by this Court relative to a motion to dismiss is an examination of the totality of the circumstances, not rigid application of specific factors. Here, the Court can find no prejudice to Rizzo nor sufficient circumstances to determine this Petition was filed in bad faith. It is undisputed that the Debtor's motive in filing Chapter 11 was to preserve its Purchase Contract. The preservation of value is a permissible motive for filing Chapter 11 and the good faith requirement must be viewed in context with Congress' intent to promote reorganization. Thus, the filing was an appropriate exercise of business judgment and protected the equity of the Debtor in the Purchase Contract for the benefit of other creditors, as well as the Debtor."

*Id.*, at p.64. *See, also, In re Empire Equities Capital Corp.*, 405 B.R. 687 (Bankr. SDNY 2009), where the Hon. Allan Gropper suggested in *dicta* that while the provisions of §108(b) cannot be invoked by every unscrupulous optionee, a bankruptcy case should not be dismissed for bad faith if there is evidence of financial distress.

25.     Here, the Debtor faced both financial and legal distress, since it was hours away from potentially forfeiting the million dollar Deposit, and state courts were not open for business. Perhaps, nothing can push an entity to the brink quicker than the potential of a forfeiture. That the Debtor had a one-time right to extend the closing to April 21, 2020 was of no moment, since it was clear that the Covid-19 crisis was not going to subside to open the state courts (and, in fact, they remain closed to new actions), leaving Chapter 11 as the only option. Had the Debtor truly wanted to delay, it could have extended, and then waited to the end of the extension period to file. That the Debtor chose to deal with the situation head-on speaks to its good faith.

### C. The Owners Cannot Meet the High Procedural Burdens

26.     While the Owners ignore the unique challenges facing the Debtor, the Motion is a paradigm of oversimplification which improperly minimizes the high burden of proof required to establish bad faith. For example, it has been recognized in *In re Consolidated Distributors, Inc.*, 2013 WL 3929851 *7, fn. 47 (Bankr. E.D.N.Y. 2013) that "[m]any courts have held that dismissal on bad faith grounds should be granted sparingly". *See also*, *In re Century/ML Cable Venture*, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003) ("dismissal for bad faith is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances"); *In re Sletteland*, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001) (noting that courts dismiss cases on bad faith grounds sparingly); *In re 234-6 W. 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997) (same); *In re Johns-Manville Corp.*, 36 B.R. 727, 737 (Bankr. S.D.N.Y.

1984) (dismissal on bad faith grounds should be granted sparingly, and only upon a clear showing of abuse of bankruptcy process, avoiding an "intense focus on the debtor's motives in filing").

27. Given the high standard, the burden of proof rests squarely on the Owners as the Movants. *See*, *In re Greene*, 57 B.R. 272, 276 (Bankr. S.D.N.Y. 1986). However, other than reference to various factors in the abstract, the Owners have not met their burden of demonstrating both objective and subjective bad faith.

### D. *Cohoes* and the *C-TC 9th Avenue Factors*

28. In support of their Motion, Owners cite to the well-known test for good faith/bad faith developed by the Second Circuit in *In re Cohoes Industrial Terminal Inc.*, 931 F.2d 222 (2d Cir. 1991). To help courts in applying this test, in *In re C-TC 9th Avenue Partnership* the Second Circuit identified various factors for the courts to consider, mostly applicable to mortgage foreclosures:

> (1) the debtor has only one asset;
> (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
> (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
> (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
> (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
> (6) the debtor has little or no cash flow;
> (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and
> (8) the debtor has no employees.

*Id.,* 113 F.3d at 1311.

29. Owners attempt to check off the *C-TC 9th Avenue* factors in mechanical fashion, citing that the Debtor's assets consist of the Sale Contract and Deposit, the Debtor has few

10

creditors (even though the Deposit was borrowed), the dispute essentially involves two parties, and the petition was filed on the eve of the time of the essence closing. Because the Debtor had potential rights to extend the closing, this was not an act of desperation, and the *C-TC 9th Avenue* test does not address the governing principle that invoking Congressionally established protections under 11 U.S.C. §108(b) is not bad faith.

30. In any event, "courts repeatedly caution, however, not to apply (CTC 9th Avenue factors) mechanically . . . Lists of such factors, then ultimately do no more than assist the exercise of discretion." *In re 68 West 127 Street, LLC*, 285 B.R. 838, 834 (Bankr. SDNY 2002); s*ee, also In re R & G Properties, Inc.*, 2009 WL 1076703, at *2 (Bankr. D. Vt. Apr. 16, 2009) ("Simply checking off these factors on the list does not prove bad faith.").

31. It is the norm in commercial real estate for a would-be purchaser of real property to organize a single purpose entity to take title. Virtually by definition, a single purpose entity holds a single asset, has a limited number of creditors, and only a few employees, if any. Consequently, no adverse inference should be drawn because the Debtor does not have the attributes of a retail, wholesale, or service business. Indeed, there is no *per se* bad faith rule simply because a real estate company seeks Chapter 11 relief.

32. Accordingly, in performing a good faith analysis, it is important to bear in mind the comments by the Court in *In re Clinton Centrifuge, Inc.*, 72 B.R. 900, 905 (Bankr. E.D.Pa. 1987), which explained that:

> In engrafting the good faith requirement into the Code, courts must be careful not to upset the delicate balance of interests fashioned by Congress under chapter 11. Moreover, to the extent that the concept of good faith exists independent of other Code provisions (such as adequate protection), courts must be vigilant to apply this concept in ways consistent with the legislative policy decisions embodied in these other [Code] enactments. Thus, in evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by

> employing it for a purpose for which it was not intended. When a debtor is motivated by plausible legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a chapter 11 case.

*33.* Here, the Debtor has invoked the Court's core jurisdiction through the Adversary Proceeding, in seeking to vindicate important contract rights involving the Debtor's primary asset. *See, In re Strathmore Group LLC*, 522 B.R. 447, 452-453 (Bankr. E.D.N.Y. 2014 ("[M]atters requiring a declaration of whether certain property comes within § 541's definition of 'property of the estate' are core proceedings.' Furthermore, 'the bankruptcy court has core jurisdiction to adjudicate all of those interests' professed by a debtor and its creditors in averred property of the estate.")(Internal citations omitted); *In re U.S. Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999) (holding litigation over pre-petition contracts is core when the contracts constitute a significant assets of the estate and the resolution of the disputes will have a significant impact on the administration of the estate).

34. That the Debtor is using the Bankruptcy Code in a way that was intended by Congress strongly militates against a finding of bad faith. Nevertheless, the Owners argue that the Debtor had only to place the Deposit in escrow and litigate later when the state courts reopen and did not necessarily need Chapter 11 relief. However, this forces the Debtor into a Hobson's choice of forsaking any possible closing if it is later found that there is no right of rescission. By proceeding in Bankruptcy Court, the Debtor opted to preserve all of it rights based on the safety net of 11 U.S.C. §108(b).

### E. Objective and Subjective Tests

35. The Hon. Nancy Hershey Lord explained in *In re Consolidated Distributors, Inc., supra*, 2013 WL 3929851 at *7 that the Second Circuit cases of *Cohoes* and *C-TC 9th Avenue* combine an analysis of objective futility and subjective bad faith to determine whether, at the time of the filing, the Debtor intended to reorganize and whether a reasonable chance exists for the Debtor to emerge from bankruptcy. *See also, In re 68 West 127th Street LLC, supra*, 285 B.R. at 846 (Bad faith exists if it is clear on the filing date there is no reasonable likelihood that the debtor intended to reorganize and the debtor has no probability to emerge from bankruptcy); *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) ("[T]he standard in this Circuit is that a bankruptcy petition will be dismissed if *both* objective futility and subjective bad faith in filing the petition are found." (emphasis in original)).

36. Owners attempt to conjure up bad faith by arguing, without support, that the Debtor fails both the objective and subjective tests because it allegedly neither intends to reorganize, nor is capable of reorganizing. The Owners are wrong on both counts.

37. First, the Owners badly misread the Debtor's Local Rule 1007-4 Affidavit, which Owners contend contains admissions that the Debtor seeks only to rescind the Sale Contract in order to recover its Deposit, and does not intend to reorganize. Notably, Owners cite no specific language to support this warped misinterpretation.

38. In fact, in Paragraph 17 of the Local Rule 1007-4 Affidavit, the Debtor stated

> Rather than risk even the possibility of an unjust forfeiture, the Debtor is filing this Chapter 11 petition to preserve all of its rights, remedies and defenses under the Sale Contract, while the myriad legal issues surrounding the Debtor's fraudulent inducement claim are litigated or otherwise resolved.

39. While it is true that rescission is one of the rights that the Debtor seeks to adjudicate, this paragraph makes clear that the Chapter 11 petition was filed to preserve "all of its rights, remedies and defenses", including the right to close should rescission prove to be unavailable.

40. Regarding the Debtor's ability to reorganize, Owners somehow argue that the Debtor cannot pursue a closing because the Sale Contract allegedly terminated prior to the Chapter 11 filing. The Owners are flat wrong on this point when they assert that:

> The TOE Closing Date has passed without pre-petition extension and was a time of the essence obligation that cannot be now cured because it is historical fact. Failing to close by the specified closing date in a sale contract that is declared to be time of the essence is a material breach which terminates defaulting party's right to enforce the contract under New York law.

Motion at ¶27.

41. This statement misstates the law. Since the Chapter 11 as filed on April 6, 2020, one day prior to the April 7, 2020 closing date, the clear provisions of 11 U.S.C. §108(b) automatically extended the time of the essence closing deadline, and there was no breach. *See, In re AAGS Holdings LLC, supra*, 608 B.R. at 382 (noting again that "[B]ecause the PSA was live, Bankruptcy Code § 108(b) extended the Closing Date by sixty days").

42. Owners also argue that the Sale Contract terminated before the Chapter 11 case was commenced by reason of an anticipatory breach. This is pure sophistry, but in any event, whether there was an anticipatory breach is an issue of fact to be determined at trial in the Adversary Proceeding and is not a proper basis for finding bad faith or dismissal.

43. However, it is noteworthy that Owners' evidence of a repudiation of the Sale Contract rests on communications with Debtor's counsel that a Chapter 11 filing was imminent. The heads-up notice to Owners' counsel was given as a courtesy during a time of crisis, and was

never meant as a repudiation of the Sale Contract. To the contrary, it has always been the Debtor's intent to seek a determination of its rights and then make a decision on whether to exercise rights of rescission or potentially move forward with a closing.

### F. There is No Cause to Vacate the Stay

44. Owners seek the alternative relief of vacating the automatic stay, asserting that cause exists because the Debtor has no right to close under the Sale Contract by reason of the alleged anticipatory breach. For all of the reasons set forth above, this contention is without merit, and conflates the meaning of emails issued in an attempt to avoid unnecessary preparation by counsel. Thus, this alternate prong of the Motion is equally flawed and premature at best.

45. Most importantly, however, Owners cite no reason why stay relief should be granted in the first place since, as Owners must concede, there are no state courts available in which to litigate any issues relating to the Sale Contract. In the absence of an alternate forum, there is nothing to be gained by lifting the stay, and this branch of the Motion should be denied. Indeed, even when the state courts eventually reopen for new business, it could take years to obtain an adjudication of the Debtor's claims. Bankruptcy affords the parties the prospect of a much quicker resolution through negotiation or litigation.

WHEREFORE, based upon all of the foregoing, the Owners' Motion should be denied, and the Debtor granted such other and further relief as is just and proper.

Dated: New York, New York
       May 6, 2020

                                      GOLDBERG WEPRIN FINKEL
                                      GOLDSTEIN LLP
                                      Attorneys for the Debtor
                                      1501 Broadway, 21st Floor
                                      New York, New York 10036
                                      212) 221-5700

                              By:    /s/ Kevin J. Nash, Esq.